**H. Morrison SMITH and Dwight S. Smith, Plaintiffs,**

v.

**CENTRAL SOYA OF ATHENS, INC., and Sun City Industries, Inc., Defendants.**

**No. 82–70–Civ–8.**

United States District Court,
E.D. North Carolina,
Wilson Division.

March 5, 1985.

on the basis of motions for summary judgment.

George R. Kornegay, Jr., Mount Olive, N.C., for plaintiffs.

Robert W. Spearman, Raleigh, N.C., for Cent. Soya.

William R. Rand, Wilson, N.C., for Sun City.

## ORDER

JAMES C. FOX, District Judge.

Plaintiffs initiated this action by complaint filed against defendant Central Soya of Athens, Inc. (hereinafter Central Soya), an Indiana corporation, in Wayne County Superior Court on December 10, 1982. Central Soya removed the case, on the basis of diversity of citizenship, to this court on December 23, 1982. Plaintiffs then filed an amended complaint, with leave of the court, on April 6, 1983, adding Sun City Industries, Inc. (hereinafter Sun City), a Delaware corporation, as an additional defendant and, further, adding a claim for relief under North Carolina's Unfair and Deceptive Trade Practices Act, N.C.GEN. STAT. § 75–1.1 *et seq.* [1]

This matter is before the court on Sun City's motion for summary judgment and Central Soya's motions to strike and for judgment on the pleadings or, alternatively, summary judgment. The parties have expertly briefed the relevant issues and following oral argument, defendants' motions are now ripe for disposition.

Plaintiffs seek compensatory and punitive damages for injuries allegedly caused by defendants' breach of contract and violations of § 75–1.1. Plaintiffs assert that defendants induced plaintiffs to build four (4) poultry houses by representing defendants would supply the chickens for such houses and that plaintiffs would "have an income for twenty (20) years on the poultry houses." The amended complaint alleges defendants later refused to provide additional chickens, thereby breaching their promise and damaging plaintiffs. Plaintiffs further contend defendants' representations were "fraudulent, unfair and deceptive."

1. Central Soya answered plaintiffs' amended complaint on May 10, 1983, and cross-claimed against Sun City. Sun City answered Central

Both defendants deny the breach of any contractual duty. Extensive discovery has occurred and the following discussion constitutes a summary of the undisputed material facts of record taken in a light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Plaintiff H. Morrison Smith began housing chickens for Central Soya pursuant to a written egg production contract in 1971. Prior to that time, Smith had engaged in a variety of commercial enterprises, including developing and selling farmland, building chicken houses, managing a profitable pullet raising business, selling fertilizer and owning an Oldsmobile dealership.

In 1973, 1976 and 1977, Smith built three (3) additional chicken houses and, after the completion of each house, entered into a new egg production contract with Central Soya to house an additional specified number of chickens. Smith's nephew, plaintiff Dwight S. Smith, participated in building the fourth house, under the partnership name "Prima Layers."

Each egg production contract related to a particular chicken house and specified the number of chickens to be housed therein. The chickens were supplied by Central Soya. The contracts were renewed approximately every year by Central Soya supplying replacement flocks of chickens and by the continued performance of the parties under the contracts.

In December, 1981, after supplying chickens to plaintiffs for ten years, Central Soya sold its business to Sun City, assigning to Sun City all of its interests and rights in the egg production contracts with plaintiffs. Sun City agreed to assume all duties and obligations of Central Soya under the contracts. With H. Morrison Smith's agreement, Sun City completed performance under the contracts for the production period then in progress.

Soya's cross-claim on May 31, 1983 and the amended complaint on June 14, 1983.

In April, 1982, Sun City offered plaintiffs replacement chickens and a new egg production contract for the fourth (Prima Layers) chicken house. Plaintiffs refused to accept the offer. As a result, Sun City removed all chickens in plaintiffs' houses at the end of the laying cycle in August, 1982 and supplied no further replacement chickens. Plaintiff subsequently initiated this action.

Between 1971 and 1976 five (5) written contracts were entered into between plaintiff H. Morrison Smith and Central Soya. Contract 4, entered into on February 16, 1976, superceded contracts 1 through 3 and covered the first two chicken houses. Contract 5 related to the third house, and was executed on June 6, 1976. A fifth and final contract was executed between Central Soya and the Prima Layers partnership on September 12, 1977. It covered the fourth house. Pursuant to each contract, H. Morrison Smith or Prima Layers (the "producer") agreed to furnish the "necessary housing, equipment, utilities, litter and labor necessary for the proper care and housing of the chickens and the proper production and care of eggs covered by [that] contract." In return, Central Soya (the "owner") agreed to supply each house with a specific number of chickens (a "flock") and to pay the producer a designated sum per month for the producer's services. Furthermore, Central Soya agreed to transport and deliver all eggs produced by the chickens and to pay the cost of delivering the chickens to market when their usefulness as layers ended.

Critically, at all times the chickens and any eggs they produced remained the sole property of the owner. The owner retained the right to sell, mortgage or dispose of the chickens at any time "at its pleasure." Contracts 4–6, § 3. The owner retained the right to enter the producer's premises to remove the chickens or to feed and care for them should they become endangered "for any reason in the opinion of the owner." *Id.*

Finally, each contract contained an express and unambiguous merger clause providing that "[t]here are no agreements, understandings, representations or warranties between Owner and Producer except those herein set forth ..." *Id.* at § 10. Each contract further provided that it "may not be modified by agreements hereinafter made unless the same be attached hereto in writing." *Id.* [2]

Under each contract, Central Soya was obligated to supply and plaintiffs to house and care for, one flock of chickens. *Id.* at § 12(b) [3] The size of the flock varied depending on the poultry houses involved, but each contract specified the exact number of chickens to be supplied under the contract. Central Soya faithfully supplied the specific number of chickens required by each contract.

Thereafter, each contract was renewed, one flock at a time, and the parties continued performance under the contracts without incident until December, 1981. At that time, Central Soya assigned its contracts with plaintiffs to Sun City. As previously detailed, plaintiffs and Sun City did not renew the contract after completing performance for the laying period then in progress.

Plaintiffs' complaint focuses on alleged oral representations made to them by agents of Central Soya to the effect that they "would continue putting poultry in the houses" and that plaintiffs "would have an income for twenty (20) years on the poultry houses." H. Morrison Smith testified in his deposition that the agents made these oral representations during negotiations and *prior to* the execution of the 1971, 1973, 1976 and 1977 written contracts. In reliance upon these representations, plaintiff alleges he constructed the chicken

---

**2.** Written supplements were issued in November, 1979 and January, 1981 modifying the payment schedules and were attached to the original contracts.

**3.** Although not specifically defined in the contracts, the parties agree that the useful laying period of a flock, as those terms were intended to be used in the contracts, was roughly one year. *See* Contracts 4–6 at § 12(b).

houses and, therefore, Sun City's decision not to supply the replacement chickens breached oral and written contracts plaintiffs had with the defendants.

### (A). Breach of Contract Claim

The primary issue before this court on plaintiffs' breach of contract claim is whether or not the purported oral representations of Central Soya's agents should be excluded as impermissible parol evidence. If the statements are inadmissible, then defendants must prevail on summary judgment for they have fulfilled all of the obligations of the contracts as written. By the same token, if the representations are admissible, then summary judgment must be denied as genuine issues of material fact would remain.

Preliminarily, in deciding whether the parol evidence at bar is admissible, the court must determine which law governs the analysis. It is generally agreed that the parol evidence rule is a rule of substantive contract law and not a rule of evidence. *United States v. Bethlehem Steel Co.*, 215 F.Supp. 62, 68 n. 12 (D.Md.1962), *aff'd.* 323 F.2d 655 (4th Cir.1963); *Rock-Ola Manufacturing Corp. v. Wertz*, 282 F.2d 208, 210 (4th Cir.1960). Under the *Erie* doctrine, a federal court sitting in diversity must apply the substantive law of the forum in which it sits, including the forum's choice-of-law rules. *Klaxton Company v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In North Carolina, issues of contract construction are determined by the law of the state where the contract was made. *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655 (1980). In this instance, the contracts involved were executed in North Carolina and, therefore, must be interpreted according to North Carolina's substantive law of contracts, including the state parol evidence rule.

■ North Carolina provides for the exclusion of parol evidence both by common law, *see Neal v. Marrone*, 239 N.C. 73, 77, 79 S.E.2d 239, 242 (1953) and by the sales article of the state's Uniform Commercial Code (UCC), N.C.GEN.STAT. § 25-2-202. The UCC's sales provisions focus on contracts for the sale of goods and are not applicable to contracts for the rendition of services. N.C.GEN.STAT. §§ 25-2-102 and 25-2-106(1) (Supp.1983). *See Wells v. 10-X Manufacturing Co.*, 609 F.2d 248, 254 (6th Cir.1979).

■ The contracts involved in this action are clearly for services and not for the sale of goods. Plaintiffs were not buyers of the chickens, rather they were paid for the care and housing of the chickens and the production of eggs. Moreover, no transfer of title to either the chickens or the eggs occurred; the owner retained title to both at all times. Defendants simply paid plaintiffs for providing the necessary services for the care of the chickens and eggs, both of which were eventually returned to defendants for sale. Therefore, since the contracts were strictly for services, the parol evidence rule of North Carolina's common law and not that of the UCC governs this action.[4] Cf. *Moore v. Allied Chemical Corp.*, 480 F.Supp. 364, 375 (E.D.Va.1979) (where chemical company supplied raw materials to a chemical manufacturer, the manufacturer processed the raw materials and returned the finished product to the chemical company which paid the manufacturer for its services, and the chemical company retained title to both the raw materials and finished product, a contract for services existed).

■ Although it is impossible to reconcile all of the statements of the parol evidence rule contained in North Carolina cases, a general statement of the rule, as succinct as any, is set forth at 2 *Brandis on North Carolina Evidence* § 251 (1982):

---

**4.** Interpretation and analysis of the common law rule by the North Carolina courts has recently begun to substantially mirror the analysis used under the UCC, *see Rowe v. Rowe*, 305 N.C. 177, 185, 287 S.E.2d 840, 845 (1982), thus, the outcome of this case would be no different under the Code. The only significant distinction appears to be with regard to the test used to determine whether a writing constitutes a total or partial integration. *See infra* at 524–525.

*Any or all parts of a transaction prior to or contemporaneous with a writing intended to record them finally are superceded and made legally ineffective by the writing.* The execution of the final writing may be termed the 'integration' of the transaction. By it all prior and contemporaneous negotiations or agreements, whether oral or written, are 'merged' into the writing, which thus becomes the exclusive source of the parties' rights and obligations with respect to the particular transaction or part thereof intended to be covered by it. (emphasis in original).[5]

The North Carolina rule applies where the writing is a *total* integration, that is, where the writing integrates all the terms of the contract and supercedes all other agreements relating to the transaction. *Craig v. Kessing,* 297 N.C. 32, 34–35, 253 S.E.2d 264, 265–66 (1979). In this situation, evidence of prior and contemporaneous negotiations and agreements are not admissible to vary, add to, or contradict the writing. *Rowe v. Rowe,* 305 N.C. 177, 185, 287 S.E.2d 840, 845 (1982). Prior or contemporaneous evidence may only be admitted to clarify an ambiguity in a totally integrated written contract. *Id., Root v. Insurance Company,* 272 N.C. 580, 158 S.E.2d 829 (1968).

■ If, however, the writing supersedes only a part of the transaction, that is, if the writing was not intended to be a complete and exclusive statement of all the terms of the agreement, then the writing is a *partial* integration. *Rowe v. Rowe,* 305 N.C. at 185, 287 S.E.2d at 845; *Borden, Inc. v. Brower,* 284 N.C. 54, 199 S.E.2d 414 (1973). In this situation, not only may prior or contemporaneous evidence be admitted to clarify any ambiguity, but evidence of con-sistent additional terms may also be introduced and incorporated into the writing by means of parol evidence. *Hoots v. Calaway,* 282 N.C. 477, 193 S.E.2d 709 (1973); *A & A Discount Center, Inc. v. Sawyer,* 27 N.C.App. 528, 219 S.E.2d 532 (1975).

The representations by Central Soya's agents, if made, were clearly uttered *prior* to the execution of the 1971, 1973, 1976 and 1977 written contracts. Thus, the initial inquiry is whether the relevant writings (Contracts 4–6) were intended by the parties as *final expressions* or *integrations* of the terms contained therein, i.e. did the parties intend the writings to evidence their final agreement with regard to the included terms in the contracts.

Plaintiffs do not really contest the fact that the writings were intended as final expressions of the terms contained therein nor could they reasonably do so. Even a cursory review of the formal documents in question, the negotiations between the parties, and the circumstances surrounding the parties' faithful performance under the signed writings between 1971 and 1982 unambiguously indicates all concerned intended the writings to be final expressions of the terms contained therein. The writings are formal instruments that clearly seek to codify the negotiations between the parties. Based on subsequent performance, both parties obviously viewed them as binding.

Having determined the existence of an integration, it now becomes necessary to ascertain whether that integration is total or partial. In resolving this issue, courts and commentators have used at least four different approaches.

The first approach is that espoused by Professor Corbin, wherein the court looks at the surrounding circumstances and con-

---

**5.** Although the common law parol evidence rule applies, the UCC contains a basically similar and certainly better-drafted rule:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contem-poraneous oral agreement but may be explained or supplemented

(a) by a course of dealing or usage of trade (§ 25–1–205) or by course of performance (§ 25–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement. N.C.GEN.STAT. § 25–2–202 (1965).

duct of the parties in an effort to determine their actual intent as manifested during the course of the particular transaction. 3 Corbin, *Contracts* § 573–596 (1963); Calamari & Perillo, *Contracts* § 3–3 (2d ed. 1977); Restatement, Contracts (2d) § 240(b), Comment a and § 236, Comments a and b. This test, in effect, emasculates the traditional parol evidence rule by admitting evidence of prior conversations and conduct to discern intent. *See* Calamari and Perillo at § 3–3 n. 45.

A second approach is that asserted by Professor Williston which essentially asks whether the additional terms were such as might *naturally* be made in a separate agreement and not included in a writing by parties situated as were the parties to the written contract. 4 Williston, *Contracts* §§ 633 and 636 (3d ed. 1957); Restatement, Contracts § 240 (1932). If this question is answered affirmatively, then the writing is a partial integration and consistent additional terms may be added. However, if the parol terms would normally have been included in the writing, then the parol evidence rule bans their admission.

The third standard is set forth in the Comments to the UCC parol evidence provision. N.C.GEN.STAT. § 25–2–202, Comment 3. "If the additional terms are such that, if agreed upon, they would *certainly* have been included in the documents, then evidence of their alleged making" is barred by the parol evidence rule. *Id.* (emphasis added).

The final test is one that simply looks at the four corners of the document and if the oral agreement varies, contradicts or supplements the written contract in any manner it is deemed of no effect. *See, e.g., Hite v. Aydlett,* 192 N.C. 166, 134 S.E. 419 (1926).

A review of state cases reveals that North Carolina does not clearly and consistently follow any of the above tests, rather, the North Carolina courts have formulated their own standard, seemingly combining elements of all four:

"... where the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty, it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing. Accordingly, all prior and contemporaneous negotiations in respect to those elements are deemed merged in the written agreement."

*Neal v. Marrone,* 239 N.C. at 77, 79 S.E.2d at 242; *Metropolitan Furniture Leasing, Inc. v. Horne,* 29 N.C.App. 400, 224 S.E.2d 305 (1976).

This approach reflects the view that situations will often arise in which the writing, on its face, clearly embodies the sum total of the parties' agreement. In these instances, further inquiry beyond the terms of the contract is not required.

By the same token, when the terms of the writing are not so definitive, then implicitly, the court must view the surrounding circumstances to ascertain the intent of the parties with regard to whether the writing was meant to be a total integration. In this latter situation, North Carolina decisions provide few useful guidelines for analyzing the circumstantial evidence of intent. Therefore, in fairness to plaintiffs, should the writing appear uncertain, the court will apply the liberal standard set forth under the *UCC* test. If plaintiffs fail to meet that standard, *a fortiori,* their complaint would not withstand application of the stricter standards. The court will now proceed to review the terms of the contracts and, if necessary, the pleadings, deposition testimony and affidavits.

Central Soya agreed, in each successive contract, to supply a designated number of chickens (one flock) for the poultry house or houses covered by the contract. Contracts 4–6, § 3. When the usefulness of the chickens as layers ended, after approximately one year, Central Soya agreed to pick them up and deliver them to market. *Id.* at § 6. Central Soya retained the right to replace the birds in the flock when above-normal mortality occurred and, further, retained the right "at any time" to "sell, mortgage or dispose of said chickens

at its pleasure without regard to any of the provisions of the contract." *Id.* at § 3.

Critically, each of the written contracts executed by the parties also contained a merger clause, providing that "[t]here are no agreements, understandings, representations or warranties between Owner and Producer except those herein set forth..." *Id.* at § 10. Defendants contend the merger clauses create, *ipso facto*, total integrations. Although the court finds the inclusion of merger clauses in the contracts decisive in this case, it declines to adopt the view that merger clauses effect a mandatory or conclusive presumption.

■ Merger clauses were developed with the parol evidence rule in mind in order to protect the parties to the contract. North Carolina clearly recognizes the validity of merger clauses and the state courts have repeatedly enforced such clauses. *See, e.g., Tar River Cable TV, Inc. v. Standard Theatre Supply Co.*, 62 N.C.App. 61, 65, 302 S.E.2d 458, 460 (1983); *Elizabeth City Hotel Corp. v. Overman*, 201 N.C. 337, 341, 160 S.E. 289, 291 (1931); *J.B. Colt Co. v. Turlington*, 184 N.C. 137, 113 S.E. 600 (1922).

■ The existence of a merger clause generally provides unambiguous and unassailable evidence of the parties' intent with reference to the terms of the contract. It clearly precludes a court from admitting extrinsic evidence on a theory that the writing was not a final expression. White & Summers, *Uniform Commercial Code*, § 2–12 (2d ed. 1980). It further creates a *rebuttable* presumption that the writing is a complete and exclusive statement of the contract terms. *See Id.* In order to rebut the presumption and, in effect, invalidate the merger clause, a party must offer evidence to establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact. *Id., See Neal*

*v. Marrone*, 239 N.C. at 77, 79 S.E.2d at 242; *A & A Discount Center v. Sawyer*, 27 N.C.App. at 530, 219 S.E.2d at 534–35. In this case, plaintiffs have failed to meet their burden of rebutting the presumption created by the merger clause.

There is no evidence in the record to support any allegation that defendants fraudulently or, in bad faith, included the merger clause or failed to include the alleged twenty year agreement in the contracts. Plaintiffs, who were experienced businessmen, acknowledged in their depositions that they read and understood the contracts prior to signing them. H. Morrison Smith admits that he "couldn't have had better relations" with Central Soya and that Central Soya always met its contractual obligations to him. He further admits that he knew the contracts were for one year and that he never asked for the twenty year term to be incorporated into the contracts.[6] Similarly, this same evidence establishes that the twenty year term was not negligently omitted nor was there a mistake in fact.[7]

■ Plaintiff's major challenge to the inclusion of the merger clause is that it is unconscionable. Unconscionability is a question of law and may properly be decided on summary judgment. *Stanley A. Klopp, Inc. v. John Deere Co.*, 510 F.Supp. 807, 810 (E.D.Pa.1981), *aff'd mem.*, 676 F.2d 688 (3rd Cir.1982). In order to prevail on a theory of unconscionability, plaintiffs must demonstrate that (1) they had no meaningful choice but to deal with the defendants and accept the contract as offered and (2) the merger clause was unreasonably favorable to the defendants. *Blalock Machinery & Equipment Co. v. Iowa Manufacturing Co.*, 576 F.Supp. 774, 778 (N.D.Ga.1983). *RJM Sales & Marketing v. Banfi Products Corp.*, 546 F.Supp. 1368 (D.Minn.1982).

---

6. *See also* the discussion *infra* at 530–531.

7. Smith alleged he relied on discussions he had with Central Soya's agents where they "implied I'd be in the business for twenty years." The twenty year term was discussed, but not included in the contracts because "I was willing to live

with what Central Soya told me." In effect, plaintiff's own testimony shows he voluntarily and intelligently waived inclusion or insistence on inclusion of the twenty year term in the contracts.

Neither of these elements is present in the case at bar. While the contracts are essentially preprinted standardized contracts used by Central Soya in connection with other "producers," thus making the merger clause basically non-negotiable, plaintiffs did not have to enter into the contracts. Plaintiffs have not alleged nor is there any evidence to suggest they were under economic duress when they executed the contracts. Furthermore, Central Soya, under the circumstances of this case, did not occupy a grossly superior bargaining position. *See Id.* at 1375.

The merger clause is also not unreasonably fair to defendants. The clause simply attempts to grant preclusive effect to the written terms of the contracts. Under other circumstances, the clause might as easily have benefited plaintiffs as it now does defendants. Finally, all the evidence in plaintiffs' depositions points unerringly to the fact that plaintiffs voluntarily signed the contracts with a complete understanding of their terms and with full knowledge they were for one year—not twenty.

For the foregoing reasons, the court concludes the merger clauses were not unconscionable, the contracts on their face constitute total integrations, and plaintiffs' parol evidence should be excluded.

However, assuming *arguendo*, that the writings were not definitive on their face, evidence of the parties' prior negotiations and conduct evinces a clear intent that the documents embody the complete and exclusive terms of the transaction. Plaintiffs read the contracts and all terms contained therein. Plaintiffs voiced no objection to the inclusion or exclusion of any provision. The contracts were fully performed by both parties without complaint for a number of years. No attempt was made to re-negotiate the terms, incorporate any new term (with the exception of the modified payment schedules in 1979 and 1981) or further explain any term of the contracts.

Furthermore, H. Morrison Smith's deposition states the contracts incorporated the terms as he understood them. Those terms specifically were for one-year, "one-flock" contracts in which Central Soya retained the absolute right to sell or dispose of the chickens at any time for any reason.

It is not the court's intention to apply the parol evidence rule in a vacuum by the use of any rigid or mechanical approach to the issue at bar. However, the record in this action unambiguously establishes the intent of the parties at the time the contracts were executed. If the twenty year term had been agreed upon, if there had been a meeting of the minds and mutual assent as to that term, it most certainly would have been included in the contracts. It was not.

Plaintiffs' problem boils down to the fact they now want more than they contracted for. Unfortunately for plaintiffs, it is too late in the game to change the rules. Accordingly, having determined the contracts constitute total integrations, the court excludes plaintiffs' offer of parol evidence and will determine defendants' summary judgment motions based upon the contracts as written.

A few comments are in order prior to a final ruling on defendants' motions with regard to the breach of contract claim. First, even if the contracts could be construed as partial integrations, only evidence of consistent additional terms is admissible. Substituting a twenty year contract for a one year contract can hardly be interpreted as consistent. Therefore, for this reason as well, the parol evidence is inadmissible.

Second, again assuming a partial integration and further assuming the parol evidence was somehow found to be consistent, Central Soya's alleged representations constitute at best mere expressions of belief or opinion regarding the future of plaintiffs' and defendants' respective businesses. The comments "we're in the chicken business to stay" and "the chicken houses will last for twenty years," even if uttered by defendants and relied on by plaintiffs, create absolutely no contractual obligation on the part of either party.

Finally, plaintiffs raise the issue of whether an implied contract with the twenty year term existed between the parties after the express expiration of Contracts 4–6. Plaintiffs are correct to the extent that after the completion of the express terms of each contract, the parties, in effect, "renewed" the contracts a number of times on a yearly basis by Central Soya's supplying replacement flocks and by continued performance of the parties under the terms and conditions set forth in the written contracts. Such continued performance may indeed create "implied contracts," but the performance must clearly be under the same terms as the prior written contracts.

> Parties who have made an express contract to be in effect for one year (or any other stated time) frequently proceed with performance after expiration of the year without making any new express agreement, or extension or otherwise. From such continued action a court may infer that the parties have agreed in fact to renew the one year contract for another similar period. Illustrations can be found in leaseholds, employment transactions, and contracts for a continuing supply of some commodity. 1 Corbin *Contracts* § 18 (1950).

North Carolina has recognized implied renewal of express contracts by continued performance in the leasehold context, where a tenant remains on the premises at the end of a one year lease, continuing to pay rent which the landlord accepts. *See, e.g., Kearney v. Hare,* 265 N.C. 570, 573, 144 S.E.2d 636, 638 (1965). In such situations, the courts have considered the tenant as a holdover under a year-to-year tenancy with the same terms as the original lease, terminable at the expiration of any subsequent one year term. *Vernon v. Kennedy,* 50 N.C.App. 302, 303–04, 273 S.E.2d 31, 32 (1981).

■ Here, analogously, the parties by their conduct "held over" or impliedly renewed the contracts beyond their original terms. However, the same terms governed their relationship and the parties clearly continued to operate on a year-to-year (or flock-to-flock) basis, subject always to expiration of the contracts at the end of any year and the right of the defendants to sell or dispose of the chickens at any time for any reason.

Returning to the ultimate issue on plaintiff's first cause of action, with the parol evidence excluded, the entire agreement of the parties is set forth in the written contracts. The basic premise behind the law of contracts is to enforce the written agreements of parties. The express terms of the contracts in this case are unambiguous and, therefore, summary judgment is appropriate if no genuine issue of material fact remains regarding the parties' performance thereunder. *See Freeman v. Continental Gin Company,* 381 F.2d 459 (5th Cir.1967).

■ Plaintiffs do not contend Central Soya or Sun City improperly removed any chickens prior to the end of the laying cycle. In fact, plaintiffs do not allege a violation of or failure to perform any term of the written contracts. Rather, the Smiths contend only that Sun City failed to supply new flocks of chickens for all of the chicken houses at the end of the 1981–82 laying cycle, when the prior flocks were removed. By such action, Sun City did nothing more than decline to renew the contracts by ceasing performance after the end of the contract period. This conduct fails to constitute a breach of any of the written or implied contracts between the parties. Therefore, defendants' motions for summary judgment are GRANTED as to plaintiffs' breach of contract claim and that claim is DISMISSED from this action.

### (B). *§ 75–1.1 Unfair Trade Practices Claim* [8]

■ Plaintiffs also allege, in paragraph 13 of their amended complaint, that "the

---

**8.** N.C.GEN.STAT. § 75–1.1 provides that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are" unlawful. N.C.

representations and assurances by defendants and their agents were fraudulent, unfair and deceptive acts under the North Carolina Unfair and Deceptive Trade Practices Act ..." [9] Having found no breach of contract and, therefore, implicitly no fraudulent, unfair or deceptive act on defendants' part in the formulation or execution of the contracts, this claim should be and hereby is DISMISSED on the basis of the court's discussion with regard to plaintiff's breach of contract claim.

However, assuming *arguendo*, that a § 75–1.1 claim could remain viable despite a holding that the contracts entered into were not breached, the court will briefly address plaintiff's § 75–1.1 claim on independent grounds.

The alleged "representations and assurances" referred to in the amended complaint are that the defendants "would furnish chickens to the houses and that the plaintiffs would have an income for twenty (20) years on the poultry houses," and that the defendants "would continue putting poultry in the houses." Amended Complaint at §§ 5 and 10. Plaintiffs allege that they constructed four poultry houses in reliance upon the first representation, thereby incurring "a substantial indebtedness which was being paid off by the income from the housing of the poultry," and that the plaintiffs started housing poultry for the defendants and continued to do so up until the defendants failed to provide further poultry for the houses. *Id.*, at §§ 6, 7 and 9.

First, as a matter of law and contrary to plaintiffs' contentions, the allegations in the amended complaint are insufficient to state any claim for actual fraud. Fraud clearly constitutes a type of deception prohibited by N.C.GEN.STAT. § 75–1.1. *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342 (1975).[10] The essential elements of actual fraud are:

(a) that defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that defendant knew the representation was false when it was made or made it recklessly without any knowledge of its truth and as a positive assertion; (d) the defendant made the false representation with the intention that it should be relied upon by plaintiffs; (e) that plaintiffs reasonably relied upon the representation and acted upon it; and (f) that plaintiffs suffered injury. *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 253, 266 S.E.2d 610, 615 (1980). *See, e.g., Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); *Rosenthal v. Perkins*, 42 N.C.App. 449, 451–52, 257 S.E.2d 63, 65 (1979).

The pleader must allege material facts and circumstances sufficient to support each element of fraud. *Id.*, 42 N.C.App. at 452, 257 S.E.2d at 65–66. In addition, Rule 9 of the Federal Rules of Civil Procedure requires that the factual circumstances supporting all allegations of fraud be stated "with particularity." Likewise, North Carolina courts require the pleader to state "with particularity the time, place and content of the false misrepresentation ..." *Coley v. North Carolina National Bank*, 41 N.C.App. 121, 125, 254 S.E.2d 217, 219 (1979). A mere conclusory allegation of fraud is insufficient to meet

GEN.STAT. § 75–16 provides that a person injured by such acts is entitled to treble damages. *See* discussion *infra* at 530–531.

**9.** Breach of contract alone has been held insufficient for a violation of N.C.GEN.STAT. § 75–1.1. *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712 (4th Cir.1983); *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir.), *cert. denied*, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (noting holding in *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981) that showing of bad faith unnecessary, but holding still that violation of § 75–1.1 re-

quires "something more than an ordinary contract breach"). As a result, the plaintiffs allege that "representations and assurances" of the defendants were fraudulent, unfair, and deceptive, and do not contend that the purported breach of contract alone violated the statute.

**10.** "Proof of actual fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts; however, the converse is not always true." *Hardy v. Toler*, 288 N.C. at 309, 218 S.E.2d at 346.

the particularity requirement. *Id., Patuxent Development Co. v. Bearden,* 227 N.C. 124, 128, 41 S.E.2d 85, 87 (1947).

 Plaintiffs simply have not alleged facts sufficient to support the essential elements of a claim of fraud with any degree of particularity. The amended complaint fails to allege the essential element that the purported representations of the defendants were false when made. *See Myrtle Apartments, Inc. v. Lumbermen's Mutual Casualty Co.,* 258 N.C. 49, 127 S.E.2d 759 (1962). At most, plaintiffs have alleged a promissory representation by Central Soya of its intent to supply chickens *in the future,* which representation was in fact carried out for over 10 years; and an opinion as to the expected productive period of the chicken houses. It is well recognized, however, that an unfulfilled promise alone cannot be made the basis for an action for fraud unless the promise was made fraudulently with no intention to carry it out. *Gadsden v. Johnson,* 261 N.C. 743, 747, 136 S.E.2d 74, 77 (1964) (demurrer sustained where complaint merely alleged failure by defendants to carry out promissory representations). Moreover, mere statements of opinion as to the future quality or value of a product "are not regarded as fraudulent in law," since they are not misrepresentations of a "subsisting fact." *American Laundry Machinery Co. v. Skinner,* 225 N.C. 285, 290, 34 S.E.2d 190, 193 (1945) (plaintiff entitled to judgment on pleadings where representations relied upon by defendant to establish defense of fraud were mere statements of opinion).

In addition, the few facts which plaintiffs *do* allege concerning the purported representations lack the particularity required by Rule 9. The amended complaint fails to provide any detail as to the time or place of the purported representations, or as to the identity of the speaker or speakers. *See Coley v. North Carolina National Bank,* 41 N.C.App. at 125, 254 S.E.2d at 220. Accordingly, as a matter of law, any § 75–1.1 claim premised on actual fraud must be DISMISSED.

 Second, plaintiffs' own evidence fails to support *any* § 75–1.1 claim and, therefore, summary judgment must be granted as to plaintiffs' second cause of action *in toto.* To violate § 75–1.1, the act or practice in or affecting commerce must be either (1) deceptive or (2) unfair *and* (3) such act or practice must result in injury to the plaintiff. *Marshall v. Miller,* 302 N.C. 539, 276 S.E.2d 397 (1981). A trade practice is deceptive if it has the capacity or tendency to deceive. *Id.* at 548, 276 S.E.2d at 403. A practice is unfair, according to the North Carolina courts, when it "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id., Overstreet v. Brookland, Inc.,* 52 N.C.App. 444, 279 S.E.2d 1 (1981). Apparently, "unfairness" is broader than and subsumes the concept of "deception." *Id.* Whether a trade practice is unfair or deceptive depends on the circumstances of each case and the impact of the practice in the marketplace. *Marshall v. Miller,* 302 N.C. at 548, 276 S.E.2d at 403; *Johnson v. Phoenix Insurance Co.,* 300 N.C. at 262–63, 266 S.E.2d at 621.

Plaintiff's evidence, as forecast in H. Morrison Smith's deposition testimony concerning Central Soya's purported representations and assurances, is inadequate to support any claim of deceptive acts or conduct. As for plaintiffs' allegation of fraud, no evidence exists to establish any misrepresentation related to a *past* or *existing fact* nor is there evidence of record to support a reasonable inference that any representation made was *false* at the time it was uttered.

As previously discussed, Central Soya's purported representation that it was in the chicken or commercial egg business to stay, at most can be characterized as a promissory statement of future intent. There is no evidence that any past or existing fact was misstated by this expression of opinion as to the expected future status of the corporation.

Plaintiffs' evidence merely establishes that, after more than ten years of doing

business with plaintiffs, Central Soya sold its egg production business to Sun City in late 1981. This fact alone, however, raises absolutely no inference that the previous representations were false. No evidence exists to infer fraudulent intent when the statement was allegedly made.

In addition, plaintiffs contend Central Soya represented it would take plaintiffs from seven (7) to ten (10) years to pay for the chicken houses, but that the houses themselves would last at least twenty (20) years. H. Morrison Smith's deposition at 35, 38–39, 42, 67 and 79. This purported representation can be considered nothing more than a statement of opinion as to the quality and duration of the houses and their potential for generating income. The statements, if made, are legally insufficient to support a claim for fraud, *see American Laundry Machinery Co. v. Skinner*, 225 N.C. 285, 290, 34 S.E.2d 190, 194 (1945), and furthermore, H. Morrison Smith admitted in his deposition that he had no complaint against Central Soya for the condition, quality or cost of the houses. H. Morrison Smith's deposition at 40, 46.

Similarly, nothing in plaintiffs' evidence supports a finding that defendants' statements or actions were deceptive in any non-fraudulent manner or unfair. H. Morrison Smith was an experienced businessman who clearly knew the obligations imposed by the contracts he signed and who operated under the provisions of the contracts, without complaint, for a number of years. Dwight Smith testified that he thought the contract on the fourth house was a "good deal," even knowing Central Soya had the right to remove the chickens at any time. D. Smith's deposition at 8–9. The contracts were for one year terms and after the "implied" 1981 contracts ended, Sun City offered plaintiffs a contract on the fourth house, which was refused. Accordingly, Sun City had every right to re-

move the flocks in May and August of 1982.

Further recitation of the evidence would be repetitive and serve no useful purpose. There simply is nothing in the record to support a finding of deception or unfairness on the part of defendants, even assuming all the alleged representations were made.

Therefore, defendants' motions for summary judgment are GRANTED as to plaintiffs' N.C.GEN.STAT. § 75–1.1 claim.

## CONCLUSION

Although the court sympathizes with plaintiffs' plight, their present situation was not caused by an illegal or deceptive act of the defendants and relief in this court predicated on such allegations is unavailable. Based on the foregoing, defendants' motions for summary judgment as to both causes of action contained in plaintiffs' amended complaint are GRANTED and this action is hereby DISMISSED.[11]

SO ORDERED.

---

11. Defendants' motion to exclude from consideration the February 28, 1984, letter of plaintiffs' counsel, George R. Kornegay, is ALLOWED. Defendants' motion to exclude from consideration the attached three-paragraph affidavit of plaintiff H. Morrison Smith, is DENIED and that affidavit has been considered of record by the court. However, as defendant Central Soya argued in its response, filed March 1, 1984, this affidavit fails to raise any issue of material fact for trial. *See* response at 3.