Richard M. STEARNS, Trustee in Bankruptcy for Carolina Acoustics Co., Inc., Appellant,

v.

GENRAD, INC., Appellee.

No. 83–1611.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1984.

Decided Nov. 20, 1984.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 28, 1985.

Noel Lee Allen, Raleigh, N.C. (William D. Harazin, R. Bradley Miller, Frank M. Parker, Jr., Barringer, Allen & Pinnix, Raleigh, N.C., on brief), for appellant.

George L. Little, Jr., Winston-Salem, N.C. (F. Joseph Treacy, Jr., Petree, Stockton, Robinson, Vaughn, Glaze & Maready, Winston-Salem, N.C., on brief), for appellee.

Before HALL and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge.

This is primarily an antitrust case commenced by Carolina Acoustics Company, a former regional distributor of sound-measurement devices manufactured by the defendant Genrad, Inc. Prosecution of the case was continued by Carolina's trustee in bankruptcy.

Until 1979, Genrad utilized regional distributors who, collectively, were responsible for approximately 30% of Genrad's sales. The distribution agreement permitted Genrad to compete with its distributors, and approximately 70% of its sales were direct sales. In that year, however, a decision was made by Genrad's officials to terminate all of their distributors and, thereafter, to sell only directly.

In its complaint, Carolina alleged (1) restraints of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and § 3 of the Clayton Act, 15 U.S.C. § 14; (2) attempted monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (3) breach of the distributorship agreement; and (4) unfair or deceptive trade practices in violation of N.C.Gen.Stat. § 75–1.1(a).

In response to the complaint, Genrad counterclaimed for $48,448.31 due it upon a promissory note executed and delivered by Carolina.

■ The district court granted summary judgment for Genrad on all claims, including its counterclaim.[1] 564 F.Supp. 1309.

---

1. After announcing its intention to grant partial summary judgment, the district judge requested

We conclude that summary judgment was properly entered for Genrad on all of Carolina's claims and on its counterclaim.

### I.

In answer to an interrogatory, Genrad identified twenty-one documents that it had withheld from production on the basis of a claim of attorney-client privilege. Carolina asked the district court to inspect the documents *in camera*, but the motion was denied after argument. Carolina then filed a motion to reconsider as to only two of the original nineteen documents. Genrad submitted those two documents to the court. After an *in camera* inspection of those two documents, Genrad's claim of privilege was upheld, and the defendant's motion to compel was denied.

■ On appeal, Carolina complains of the failure to compel production of the two documents reviewed *in camera* and other documents as well. None of them were made a part of the record, however, and Carolina sought no order placing them under seal and making them part of the record. All we have is Genrad's very general description consisting principally of identification of the author, addressee and recipients of copies. We do know that the district court, after inspecting two of them, upheld the claimed privilege, but we cannot examine any of the documents and thus are unable to review the rulings of the district court which kept them from being seen by Carolina.

### II.

In its trade restraint claims, Carolina contended that Genrad unlawfully fixed prices, imposed unreasonable territorial and customer restrictions and required Carolina to deal exclusively in Genrad products.

■ Whatever other infirmities there may be in those claims, recovery upon any of them is foreclosed by the absence of any evidence of injury to Carolina. A violation of the antitrust laws is not compensible unless the violation has occasioned an antitrust injury. *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787, 792 (5th Cir.1982); *Windham v. American Brands, Inc.,* 565 F.2d 59, 65 (4th Cir.1977); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

### A.

■ The price fixing claim arose from the fact that Genrad limited discounts to state agencies to 5% below retail. However, Carolina conceded that Genrad never quoted less than list prices to state agencies. In price competition Genrad was always higher than its distributors in sales to state agencies. There was testimony that another of Genrad's distributors once underbid Carolina, but this suggests only that Genrad was not aggressively enforcing the discount limitation. There was also testimony that one state agency made one purchase directly from Genrad because of considerations other than price, but that agency returned to Carolina for its subsequent purchases. There was nothing else to indicate any injury from the alleged resale price maintenance scheme.

### B.

In the original distributorship agreement, Genrad agreed to provide Carolina with support personnel and sales assistance in a territory consisting of North Carolina, South Carolina, Georgia, Alabama and eastern Tennessee. The 1976 revision contains no reference to Carolina's territory, and both distributorship agreements expressly conferred upon Carolina a right to sell Genrad products outside of its designated territory. Nevertheless, Carolina claimed that it had been informally told not to sell out-

---

counsel for Genrad to prepare and submit a proposed opinion. They submitted a proposed opinion addressing all of Carolina's claims, and that was adopted by the district judge with little change. We do not encourage that practice. *See Cuthbertson v. Bigger Bros.,* 702 F.2d 454 (4th Cir.1983).

side its territory, and the right of cancellation was an effective enforcement tool.

■ Carolina's salesman, Tenpenny, testified that he was not aware of any territorial restriction, and there was evidence of sales by Carolina outside its territory aggregating approximately $100,000. The only suggestion of a lost sale is the loss of a sale in California to a competing Genrad distributor. It was unexplained, however, how Carolina might effectively compete with west coast distributors in making sales in California. Nor is that lost sale related to the alleged territorial restriction.

### C.

Without corroboration, Carolina's former president testified that it was forbidden to bid against Genrad for sales to the General Services Administration of the United States. GSA was the largest single customer for sound-measurement products in the country.

■ There was no evidence, however, that Carolina could have effectively competed with Genrad in making sales to GSA. There was evidence that GSA insisted that bidders offer to it their lowest prices only, which, for Genrad, were the prices at which it sold to its distributors. If there were an informal restriction upon bidding, it occasioned a loss of no sale upon which a profit might have been made.

### D.

■ There was testimony that Carolina was required to deal exclusively in Genrad products. The evidence is equivocal, however, for there is evidence that Carolina dealt rather extensively in the products of another manufacturer, Columbia. Nevertheless, if there were such a restriction, there is no evidence of any injury to Carolina. There was no evidence of any opportunity to represent any other manufacturer which was declined because of the restriction. Carolina's economist seems to have believed that the exclusivity requirement enhanced Genrad's monopoly position, impairing Carolina's ability to compete effectively against Genrad. However, any injury occasioned by monopolization is not the kind of injury contemplated by § 3 of the Clayton Act.

### III.

The district court rejected Carolina's attempt to monopolize claim under § 2 of the Sherman Act upon the ground that Carolina had not sufficiently defined the relevant market because it had submitted no evidence of the absence of cross elasticity of demand.

■ If there is cross elasticity of demand or interchangeability of products, as in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), one must deal with a much larger market than if there is none. In this case, however, there is no suggestion of the presence of cross elasticity of demand or interchangeability of products. However, Carolina's definition of the relevant market is fatally deficient for another reason.

Carolina defined the relevant product market as "portable acoustic measurement and analysis equipment and accessories ..." It never specifically said that the market as thus defined was the manufacture of such products, but in discussing Genrad's market share, it consistently referred to Genrad's share of the manufacturing market. Of course, Carolina did not compete in that market. It competed with Genrad and other manufacturers and distributors of such products in the distribution market.

"It has generally been recognized that every manufacturer has a 'natural monopoly' in the sale and distribution of its own products, especially when sold under a trademark." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir.1978). *See also Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir.1972); *A.L.W., Inc. v. United Air Lines, Inc.*, 510 F.2d 52 (9th Cir.1975). The behavior of Genrad within the distribution market was not the kind of conduct to give rise to a charge of

attempted monopoly. It simply moved to control the distribution of its own products.

There is another reason this claim must fail. There was no showing of a dangerous probability of monopolization.

■ An attempt to monopolize within the prohibition of the statute is not made out unless it is shown that there was a dangerous probability that the conduct would have achieved a monopoly had it been successful. *White Bag v. International Paper Co.,* 579 F.2d 1384 (4th Cir. 1974); *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332 (4th Cir.1959). *See also* ABA Antitrust Section *Antitrust Law Developments* 140–44 (2 ed. 1985). "[A]n attempt is not made out unless the conduct, if successful, would constitute the crime." *Bowen v. New York News, Inc.,* 366 F.Supp. 651, 673 (S.D.N.Y.1973) aff'd in part and rev'd in part, 522 F.2d 1242 (2d Cir.1975) *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976).

Genrad was shown to have had 49% of the manufacturing market for its products. As distributor, however, it had handled only approximately 38% of the total distribution market; Genrad's distributors were responsible for the remaining 11%.

When Genrad terminated its distributors, it unquestionably sought to gain for itself the 11% of the distribution market its distributors theretofore had had. Whether or not it completely succeeded is unclear on this record, but we may assume that it substantially enhanced its 38% share of the distribution market. Nevertheless, there is nothing to suggest that Genrad's share of the market was so great as to give it the power to destroy competition or that its termination of its own distributors posed a dangerous probability of monopolization. Indeed, what was done was not directed at its competitors except insofar as its own distributors had been competing with it in the distribution market. In short, Genrad did what it had a right to do when it terminated its own distributors, and its conduct created no dangerous probability of monopolization in any market.

## IV.

The breach of contract claim is not referable directly to Carolina's distribution contract. It is based upon a claimed violation of a Statement of Policy, which, under the distribution contract, was binding upon Carolina but subject to change by Genrad.

The Statement of Policy provided that Genrad's district offices would refer orders for small quantities of standard catalog items to the nearest distributor, provided it was known that the distributor had those items in stock.

The Statement of Policy also provided that "sales leads" obtained from national advertising and trade shows would be referred to the distributors.

Several months before termination of the distributors, Genrad began to experiment with direct mail and telephonic solicitation of orders. Apparently, most orders and leads developed in that program were not referred to distributors. It does not appear to what extent, if any, those leads were influenced by national advertising or trade shows, though it was asserted by Genrad that a substantial proportion of them were with potential customers who had never received any of Genrad's literature from its distributors.

■ That experimental program did lead to the conclusion that Genrad's distributors were not doing as well as they might, and to the conclusion that Genrad should terminate its distributors and undertake to sell all of its products directly. In this, however, we can find no violation of the distribution contract.

We have already observed that Genrad, from the outset, was selling directly in competition with its distributors. The distribution contract provided that Genrad reserved "the right to set up other marketing channels at any time and to sell products directly or indirectly to any customer without compensation to the Distributor." One of Genrad's obligations under the contract was to help build user and industry acceptance of its products "by appropriate direct

mail selling activity." Finally, the contract bound the distributor to adhere to the Statement of Policy "as well as subsequent changes in such policies."

The introduction of the direct solicitation program was clearly authorized by the distribution contract. Genrad had the contractual right to set up other marketing channels at any time and to effect direct sales to any customer. Indeed, direct mail selling activity was said to have been among Genrad's obligations, while Genrad had the unilateral right to change its announced policies.

The only hint of substance in the claim lies in the fact that Genrad did not give advance information to its distributors of the experimental sales program it was undertaking. The contract, however, gave Genrad the right to undertake the program, and nothing in the contract suggests that Genrad was obligated to give its distributors notice in advance of any experimental resort to some other marketing channel. In short, we find no promises by Genrad which Genrad may be said to have broken.

### V.

We also find no basis for recovery against Genrad under N.C.G.S. § 75–1.1(a), which prohibits "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." *

This statute has been construed as directed against deception in connection with the sale of goods. An illustrative list of prohibited conduct was contained in an article written by the then Attorney General of North Carolina, Robert Morgan. "The

People's Advocate in the Marketplace—The Role of North Carolina's Attorney General in the Field of Consumer Protection" 6 Wake Forest Intra L.Rev. 1, 18 (1969). The construction was substantially adopted by the Supreme Court of North Carolina in *State ex rel. Edmisten v. J.C. Penney Co.,* 292 N.C. 311, 233 S.E.2d 895, 899 (1977), by a district court in North Carolina, *C.F. Industries v. Intercontinental Gas Pipeline,* 448 F.Supp. 475 (W.D.N.C.1978), and by this court, *United Roasters v. Colgate-Palmolive Co.,* 649 F.2d 985 (4th Cir.1981).

In *J.C. Penney,* the North Carolina Supreme Court held that debt collection activities of a major retailer were not within the reach of the statute, for they were insufficiently related to the sale of goods. *See also Marshall v. Miller,* 302 N.C. 539, 276 S.E.2d 397 (1981) (describing act as intended for the protection of consumers).

The complaint in this case alleged no deceptive practice except insofar as it alleges that Genrad undertook its new experimental sales program without informing its distributors. If that might be regarded as a deceptive practice, it was at least as unrelated to a sale or to a formation of a contract as was J.C. Penney's debt collection practices. Even if there had been an intentional breach of the distribution contract by Genrad, that would not have been a violation of the North Carolina statute. *United Roasters v. Colgate-Palmolive Co.,* 649 F.2d 985 (4th Cir.1981).

### VI.

At the time of termination of the distribution contract, Carolina owed Genrad approximately $50,000 for goods received but for which payment had not been

---

* As originally enacted in 1969, the statute provided in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices *in the conduct of any trade or commerce* are hereby declared unlawful. (emphasis added).

In 1977 the North Carolina legislature amended the statute to the present version cited above. The effect of that amendment was to broaden the scope of the statute beyond those limitations that the North Carolina Supreme Court had

announced in *State ex rel. Edmisten v. J.C. Penney Co.,* 292 N.C. 311, 233 S.E.2d 895 (1977). The 1977 amendments are not to be applied retroactively, however. *United Roasters, Inc. v. Colgate Palmolive Co.,* 485 F.Supp. 1049 (1980). Those acts most crucial to the plaintiff's state claim in this case occurred prior to the enactment of the amendment. We therefore have determined the scope of the statute as developed by *J.C. Penney* and other pre-amendment decisions.

made. Carolina gave Genrad a note for the balance due, and made several payments on the note before it disclaimed any further obligation. The disclaimer and the defense to the counterclaim were based upon Carolina's charges of antitrust and contract violations by Genrad. Since no such violations existed and there was no other proffered defense to the counterclaim, summary judgment properly went for Genrad on its counterclaim.

## VII.

We conclude that summary judgment on all claims was properly entered for Genrad.

AFFIRMED.