**L.C. WILLIAMS OIL COMPANY, INC., Plaintiff,**

v.

**EXXON CORPORATION, Defendant.**

**Civ. No. C–84–622–D.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

Dec. 17, 1985.

Noel L. Allen, Raleigh, N.C., and Edward S. Holmes, Pittsboro, N.C., for plaintiff.

John T. Allred and Julia V. Jones, Charlotte, N.C., and Robert L. Norris and Rene J. Mouledoux, Houston, Tex., for defendant.

## MEMORANDUM OPINION

GORDON, Senior District Judge.

This case is before the court on Exxon Corporation (Exxon)'s motion for summary judgment on plaintiff L.C. Williams Oil Company (Williams)'s remaining claims. At the conclusion of oral argument on this motion supplemental briefing on certain points was requested. These supplemental briefs and the record compiled in this case have been reviewed. For the reasons stated below, Exxon's motion for summary judgment as to plaintiff's remaining claims, Counts II and III of the complaint brought under N.C.Gen.Stat. §§ 75–1.1 and 25–1–102(3), respectively, will be granted. Partial summary judgment for Exxon was previously granted by this court on Count I of the complaint brought under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq. L.C. Williams Oil Co. v. Exxon Corp.*, CCH Bus. Franchise Guide ¶ 8406 (M.D.N.C., April 18, 1985).

## FINDINGS OF FACT

The facts giving rise to this litigation are set forth in the previous Memorandum Opinion on Count I and need not be repeated in their entirety here. Nevertheless, the court notes the following facts, construed in the light most favorable to the nonmoving party, are relevant to Counts II and III:

1. For 49 years prior to its termination in 1984, plaintiff Williams had been a distributor of Exxon products.

2. On May 13, 1981, Williams entered into a three-year written contract with Exxon. The contract listed Greensboro as the terminal out of which he [1] would draw oil. Spaces for monthly quantities for the first year of the contract were filled in and quantities for the second and third years were to be the lesser of the contract amount or purchases for the previous year.

3. In May 1982 Exxon's North Carolina District Manager gave Williams a verbal commitment to supply him with all the oil he needed. Williams proceeded to expand considerably, increasing the retail outlets served from twelve to fifty and obtaining a partnership interest in twenty-seven retail outlets.

4. In October 1982 Williams began a series of attempts to gain access to Exxon's Selma terminal, which was closer to many of his new accounts. Williams's repeated requests were all denied by Exxon, which each time cited limited supplies at the Selma terminal.

5. On May 9, 1983 Williams had a meeting with Exxon representatives who again turned down his request for Selma access. Williams told them that the increased costs associated with transporting the oil from Greensboro had made him uncompetitive in his expansion territory; therefore, it was necessary for him to obtain oil from some terminal in the Selma area, even if it was not an Exxon terminal. In a May 11, 1983 letter, Williams notified Exxon of his intent to "double brand," or to sell non-Exxon products (which he would obtain in Selma) as well as Exxon products due to Exxon's repeated refusals to give him access to Exxon's Selma terminal. In its May 20,

---

1. Williams will be discussed as a person for ease in distinguishing "him" from Exxon.

1983 reply letter denying Selma access, Exxon cited supply limits at its Selma plant.

6. On September 1, 1983, following a reorganization at Exxon, W.R. Carter, the Exxon manager formerly responsible for Williams's distribution district, wrote an internal memorandum to W.N. Menefee, Williams's new Exxon district manager. The memorandum at one point stated, "Based on [Williams's] interest in developing stores in Raleigh and Greensboro markets, we need to look closely at designating Williams as a 'no growth' distributor." Attached to the memorandum were Williams's May 11 letter to Exxon and Exxon's May 20 reply letter, and the memorandum also stated that "[t]he attached ... will be of interest as background." Menefee's handwritten response September 7 stated, "[L]et's take action necessary to designate Williams as "no growth" if that is appropriate."

7. On November 11, 1983, Exxon began an investigation of Williams for alleged "misbranding," or selling non-Exxon products under the Exxon label. Sometime in November Exxon discovered its first case of misbranding by Williams.

8. On January 13, 1984, Exxon sent all of its distributors a "clarification letter" indicating how to double brand without misbranding.

9. On February 4, 1984, Williams and Exxon entered into a second three-year written contract. The space indicating the terminal from which Williams was to draw his Exxon supply of oil was left blank, as were the spaces for monthly quantities. Quantity was thus determined according to a boilerplate provision, which stated that unless otherwise provided, allocation would be the lesser of the contract amount or purchases for the previous contract year.

10. On February 29, 1984, Exxon representatives met with Mr. Williams and confronted him with the misbranding evidence. Williams admitted misbranding but claimed that the problems had been caused by Exxon's failure to give him Selma access. Exxon's representatives told plaintiff that

misbranding was a serious breach that "could lead to termination." Williams nevertheless continued misbranding after this meeting.

11. On March 1, 1984, these Exxon representatives wrote a letter reporting on the meeting and recommending the termination of Williams's Exxon franchise agreements. A letter was sent to Williams March 5, 1984 indicating that his termination would become effective June 11, 1984. Williams's appeal of this decision through Exxon's intercorporate review process affirmed his termination.

## DISCUSSION

For a summary judgment motion to be granted, the movant must show that there is "no genuine issue as to any material fact" remaining to justify a trial. Fed.R. Civ.P. 56(c). In a summary judgment motion, all facts must be viewed in the light most favorable to the nonmoving party. The burden on the moving party is particularly strong in antitrust cases, in which "motive and intent play leading roles and proof is largely in the hands of alleged conspirators." Hunter, 2 FEDERAL CIVIL RULES IN THE FOURTH CIRCUIT 83 (1975); see Norfolk Monument v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969).

Plaintiff contends in Count II of his complaint that Exxon violated N.C.Gen.Stat. § 75–1.1 (1982) by (1) denying Williams access to Exxon's Selma plant, an action that Williams alleges constituted an implicit territorial restriction; (2) imposing on Williams a "no growth" policy in retaliation for either Williams's growth with Exxon products beyond his implicit territorial area or his sale of non-Exxon products; and (3) discriminating against Williams by charging him a higher price for his oil than others similarly situated. In Count III plaintiff alleges separately that all of these actions evince a failure by Exxon to perform its contractual obligations in good faith. Because these earlier claims present more difficult issues, the court will review

plaintiff's claims in reverse order from their presentation in the complaint.

## UNIFORM COMMERCIAL CODE—GOOD FAITH

█ Plaintiff alleges that Exxon violated its obligation of good faith under N.C.Gen. Stat. § 25-1-203 (1965) when it failed to grant him access to the Selma terminal. Plaintiff does not allege, however, that Exxon ever violated any of the express terms of their contractual agreement. Exxon never promised Williams access to the Selma terminal; indeed, the 1981 contract listed "Greensboro" as the terminal from which Williams was to draw oil and while the 1984 contract left the location space blank, both contracts reserved to Exxon the right to determine the terminal from which Williams was to draw oil. Exxon's oral promise to provide Williams with all the oil he needed did not imply a "good faith" duty to provide it wherever Williams requested it, especially since Exxon repeatedly and consistently denied Williams Selma access.

█ The thrust of Williams's argument is that Exxon was under a good faith obligation to modify the existing contract terms when Williams's circumstances changed. Exxon's failure to modify express terms of a contract cannot be considered to be violative of the UCC's concept of good faith, however. The purpose of the good faith obligation is to determine the terms to be implied in the contract when the terms are *not* expressly provided. *Cardinal Stone Co. v. Rival Manufacturing Co.*, 669 F.2d 395 (6th Cir.1982); *Corenswet, Inc. v. Amana Refrigeration Co.*, 594 F.2d 129 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979).

█ Plaintiff also appears to contend that Exxon's internal marketing strategy, which attempted to limit distributors to one terminal, constituted a secret plan in violation of Exxon's good faith obligation. The *individual* restriction on plaintiff to a single terminal, however, was not secret (it was written into Williams's 1981 contract) and the general restriction in the marketing strategy was not uniformly followed (a distributor in Virginia had been given access to more than one terminal). Moreover, plaintiff has presented no case support for his contention that a supplier of products must disclose its internal strategies to distributors. A good faith duty requiring such disclosure appears particularly inappropriate when the breadth of good faith is limited to the "honesty in fact" definition of § 25-1-201, which governs plaintiff's claim under § 25-1-203, rather than the more expansive "reasonable commercial standards of fair dealing in the trade" definition of § 25-2-103. In sum, no such duty exists under the facts and claims of this case. Summary judgment for Exxon on plaintiff's UCC claim, i.e., Claim III, should, therefore, be granted.[2]

## UNFAIR TRADE PRACTICES

█ Section 75-1.1 is a comprehensive law designed to include within its reach the federal antitrust laws. *ITCO v. Michelin Tire Corp.*, 722 F.2d 42 (4th Cir.1983) (Sherman Act § 1); *see Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 165 (4th Cir.1985) (commentators agree North Carolina's unfair trade practices act "grew out of antitrust laws"); Note, *Consumer Protection and Unfair Competition in North Carolina—The 1969 Legislation*, 48 N.C.L.Rev. 896, 908–09 (1970) (Sherman and Clayton Act violations likely to be actionable under § 75-1.1 because already actionable under FTC Act § 5, after which § 75-1.1 was modeled). It also sanctions, as part of its broad remedial purpose of promoting ethical business dealings, commercial "unfairness" and "deception" beyond traditional antitrust concepts. *Marshall v. Miller*, 302 N.C. 539, 549, 276 S.E.2d 397, 403 (1981). For violations of

---

**2.** Because plaintiff presented no North Carolina case law and generally did not pursue his common law good faith claim, it will also be dismissed.

this catch-all statute, treble damages are available under § 75–16.

■■■ Under § 75–1.1, the question of what constitutes an unfair or deceptive trade practice is an issue of law. *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342 (1975). The only question of fact is whether the defendant did what was alleged; the words "unfair" and "deceptive" need never be mentioned to the jury. NORTH CAROLINA PATTERN JURY INSTRUCTIONS FOR CIVIL CASES 813.21 at 1 & n. 5. While a court generally determines whether a practice is an unfair or deceptive act or practice based on the jury's findings, if the facts are not disputed the court should determine whether the defendant's conduct constitutes an unfair trade practice. *Hardy*, 288 N.C. at 310, 218 S.E.2d at 346–47. Summary judgment has been granted when appropriate. *Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980); *Abernathy v. Ralph Squires Realty Corp.*, 55 N.C.App. 354, 285 S.E.2d 325 (1982).

Plaintiff specifically relies on § 3 of the Clayton Act and § 1 of the Sherman Act as incorporated into N.C.Gen.Stat. § 75–1.1. Plaintiff also argues that § 75–1.1 should be read expansively and that Exxon's conduct violates the North Carolina statute even if the standards for violations of the federal antitrust laws are not met. This court is mindful that restrictive interpretations of § 75–1.1 by judges, who may feel more wedded to legal precedent than jurors, "could effectively deprive [§ 75–1.1] of much of its consumer orientation." Note, *Consumer Protection—Hardy v. Toler: Applying the North Carolina Deceptive Trade Practices Legislation—What Role for the Jury?*, 54 N.C.L.REV. 963, 964 (1976). Nevertheless, the North Carolina courts have relied upon the "more trained and disciplined judicial mind" of judges to come up with a fair and equitable result. Note, *Trade Regulation—N.C.Gen.Stat. § 75–1.1—Unfair or Deceptive Acts or Practices in the Conduct of Trade or Commerce*, 12 WAKE ·FOREST L.REV. 484, 494 (1976). Viewing § 75–1.1 liberally to enhance its broad remedial purpose while at the same time applying the *Erie* doctrine's mandate to rule as a North Carolina state court would rule, the court concludes that no commercial unfairness or deception exists in this case to warrant expansion of § 75–1.1 beyond what is contained in the Clayton and Sherman Acts. *But see infra* note 10.

### Price Discrimination

It is undisputed that price discrimination among those similarly situated constitutes a clear violation of North Carolina's unfair trade practice laws. The only question is whether Exxon charged Williams a higher price than it charged others similarly situated.

■■■ Other than Exxon's sales to the State of North Carolina, which plaintiff concedes are distinguishable, the only evidence of price discrimination presented by plaintiff was the fact that Pantry Stores—a retailer supplied by Lee Moore Oil Company, another Exxon distributor—charged its gasoline customers less than plaintiff's retailers charged. From this fact plaintiff would have the court find that Exxon gave Lee Moore a better price than it offered Williams—ignoring the possibilities that Lee Moore simply charges its retailers a lower price than Williams does or that Pantry Stores charge their customers a lower price than Williams's retailers do. The Pantry evidence is clearly insufficient; plaintiff himself in his proposed memorandum opinion refers to the facts as including merely "a *scintilla* of price discrimination evidence." (emphasis added). Summary judgment for defendant should be granted.

### "No Growth" Designation

Plaintiff Williams also alleges that he was designated by Exxon as a "no growth" distributor. "No growth," plaintiff contends, means that Exxon froze his allocation of oil at current levels and ultimately terminated his franchise.

■■■ Limiting the supply a distributor receives is not illegal by itself; Exxon obviously is not obliged to provide all distribu-

tors everything they request, and Exxon reserved this right to allocate its supplies among its distributors in its contract with Williams. While limiting the growth of supply sold to distributors is not illegal per se, however, it may be illegal if used in a discriminatory manner as a means to an improper end. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614–15, 73 S.Ct. 872, 883–84, 97 L.Ed. 1277 (1953). Plaintiff contends that Exxon selectively imposed its "no growth" policy on Williams either to limit his ability to expand his distribution area (territorial restriction) or as a punitive measure in retaliation for Williams's selling brands other than Exxon (exclusive dealing arrangement).

### A. Factual Support

Williams points to Carter's September 1983 internal Exxon memorandum and Menefee's handwritten response as support for his contention. Carter's memorandum suggests "look[ing] closely" at "designating Williams as a 'no growth' distributor" based on Williams's interest in "developing stores in [the] Raleigh and Greensboro markets." Williams cites this statement as evidence of Exxon's retaliation for his expansion beyond Exxon's implicit territorial limits. Attached to Carter's memorandum, for Menefee's "background" information, was Williams's May 11, 1983, letter to Exxon indicating his intention to double brand. Williams cites this attachment as evidence of Exxon's retaliation for his selling non-Exxon products. While plaintiff is unsure as to which factor was the true motivation for Carter's suggestion of "no growth", plaintiff points out that Menefee's response, to "take action necessary," amounts to implementation of a "no growth" policy which resulted in problems

that culminated in his termination. Plaintiff thus argues that Exxon's stated reason for ending their relationship, plaintiff's misbranding, was a mere pretext for Exxon's true retaliatory motives.

As further support for his contention that "no growth" was imposed on him in retaliation for his double branding, plaintiff points to a passage in the Exxon company manual's marketing strategy. The passage suggests that Exxon should attempt to "minimize/eliminate *multi-hatters*," which plaintiff asserts are double branders (emphasis added). Plaintiff contends that the September 1983 internal Exxon memorandum indicates a tangible step taken against him as part of a long-term Exxon plan of retaliation against double branders. Essentially, Williams is claiming that Exxon is attempting to establish in a backhanded way the exclusive dealing arrangements with its distributors that would be more difficult to defend if established openly. Plaintiff contends that this plan constitutes an unfair trade practice under N.C. Gen.Stat. § 75–1.1 (1981).

### B. "No Growth" as an Unfair Trade Practice

 Exclusive dealing arrangements and territorial restrictions may constitute unfair trade practices.[3] To survive summary judgment, however, plaintiff must show that his designation as a "no growth" distributor rises to the level of these practices.

 No case law or other support has been presented indicating that a supplier's decision to *freeze* a distributor's allocation, as opposed to a decision to decrease allocation or terminate the franchise, may constitute a violation of federal or state

---

**3.** Exclusive dealing arrangements are illegal under § 3 of the Clayton Act when they are reasonably likely "to substantially lessen competition ... in any line of commerce." Clayton Act § 3, 15 U.S.C. § 14 (1982). Exclusive dealing arrangements may also be illegal under § 1 of the Sherman Act, although the burdens for proving a violation of the Sherman Act are more rigorous than those under the Clayton Act.

*See American Motor Inns v. Holiday Inns*, 521 F.2d 1230, 1250 (3d Cir.1975) (exclusive dealing arrangement lawful under Clayton Act *a fortiori* is lawful under less stringent Sherman Act.) Territorial restrictions may be illegal under § 1 of the Sherman Act, as discussed in greater detail *infra*. (See Section A under "Selma Nonaccess").

unfair trade practice laws.[4] While a "no growth" designation used punitively could have some effect on a distributor's inclinations toward expanding either its territory or its suppliers, plaintiff has the burden of showing an ability to prove at trial the "substantial" effect on the market necessary for a violation of the antitrust laws incorporated into North Carolina's Unfair Trade Practices Act.[5] Plaintiff has not met this burden. *See Conoco, Inc. v. Inman Oil Co.*, 774 F.2d 895 (8th Cir.1985) CCH TRADE CAS. ¶ 66,342 (E.D.Mo.1984) (petroleum supplier's failure to provide more than contract-specified levels is neither antitrust violation nor breach of contract, even though more than contractual amount had been provided in past); *Smith v. Central Soya of Athens, Inc.*, 604 F.Supp. 518 (E.D. N.C.1985) (supplier refusal to renew contract despite distributor growth in reliance on first contract is neither unfair trade practice nor breach of contract). *See also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985 (4th Cir.), *cert. denied*, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (breach of contract does not always rise to level of unfair trade practice).

## C. Implementation of "No Growth"

■ Even beyond the question whether the imposition of "no growth" could constitute an unfair trade practice is plaintiff's burden to show that Exxon's plan to designate him as a "no growth" distributor actually was implemented. *See Stearns v. Genrad, Inc.*, 752 F.2d 942, 945 (4th Cir. 1984) ("A violation of the antitrust laws is not compensible unless the violation has occasioned an antitrust injury."). The evidence presented by plaintiff on this issue is insufficient even to survive a summary judgment motion.

Exxon's manager Carter, who wrote the September 1983 memorandum to Menefee, stated in an affidavit that "Williams Oil Company was never classified as a 'no growth' distributor." Carter affidavit at 2 (June 25, 1985). Plaintiff has the burden to come forward with evidence to rebut this affidavit. Plaintiff points to three events to support his claim that "no growth" was implemented against him.

### 1. September 1983 Memorandum

First, Williams cites the September 1983 internal memorandum and response. Plaintiff is correct that this evidence shows that the strategy was considered by Exxon. But that showing is insufficient to show that the policy actually was implemented. Menefee's response to Carter's suggestion was to take "necessary action" toward " 'no growth' *if that is appropriate*" (emphasis added). While the existence of the memorandum is probative that the policy would be implemented, it cannot by itself be considered sufficient to overcome a summary judgment motion. Carter's affidavit and the fact that Williams received all the oil he requested show that designating Williams as a "no growth" distributor never was deemed appropriate.

### 2. 1984 Renewal Contract

Plaintiff states that Exxon's implementation of the "no growth" policy occurred at the next available opportunity: the 1984 renewal contract. Unlike the 1981 contract, the monthly allocation spaces in the

---

4. Plaintiff's Supplemental Memorandum, in response to the court's specific request for case law or other support regarding whether freezing allocation can be an unfair trade practice, "respectfully suggest[ed] that this [was] an inquiry which should be more appropriately weighed in terms of the amount of damages that Plaintiff may have suffered."

5. While there has been a great deal of dispute over what a Plaintiff must prove to show that a Defendant's actions "substantially lessen compe-

tition," the phrase clearly requires more than merely listing Exxon's market share.

The court notes that Plaintiff did not bring this suit under N.C.Gen.Stat. S 75-5(b)(2) despite its explicit prohibition of *implied* exclusive buying agreements and its per se illegality without a showing that the defendant's actions "substantially lessen competition." *See* Aycock, *North Carolina Law on Antitrust and Consumer Protection,* 60 N.C.L.REV. 205, 240–42 (1982). The court makes no determination of this case under § 75-5.

1984 contract are left blank and a provision states that "except as provided" in those spaces or elsewhere, the annual quantity for the first year of the 1984 contract "shall be the lesser of total purchases for the prior contract year or annual quantity as specified in the contract for the prior year." Plaintiff asserts that the contract evinces a conscious effort by Exxon to codify its internal "no growth" strategy.

Plaintiff's arguments here are insufficient. The blank monthly spaces do not constitute implementation of "no growth." It is arguable that the monthly spaces were merely included as a guide to determining how the overall allocation should be divided by month. More importantly, the blank spaces in actuality did not constitute a restriction on the amount of oil Williams received. While in *theory* the blanks could be interpreted as a freeze on Williams's allocation, in practice it is undisputed that Exxon gave Williams all the oil he requested—even after the 1984 contract. Plaintiff is correct that as long as the spaces were blank, Exxon was not *obliged* to supply more oil than it had under the previous contract. This lack of obligation did not mean, however, that Exxon could not or did not give Williams more than his stated quantity. This same limit on Exxon's obligation had not prevented Exxon from giving Williams quantities far in excess—nearly double the allocation in 1983—of its contractually required amount under the 1981 three-year contract. While Exxon's internal memorandum raises some question whether this historically liberal dispensation of oil to Williams would have continued, the fact that it did continue until Williams was confronted on his misbranding—long after his May 11, 1983 notification to Exxon of his intent to double brand—answers this question adequately.

No more troubling is plaintiff's contention that the language relating the quantity levels for the first year of the 1984 contract back to the 1981 contract was new. Plaintiff notes that the first year of the 1981 contract provided a space for quantity and did not relate quantity levels back to previous contracts if that space was left blank. The 1984 contract, in contrast, provided that the overall allocation in its first year—if not specified elsewhere—would be the *lesser* of total purchases or contract levels for the prior year. Plaintiff asserts that this constituted an attempt by Exxon to follow its "1984/85 contract strategy guidelines" and limit growth of allocations to its distributors.

While the 1981 contract did not include the relation back language in its first year of coverage, its second and third years contained language virtually identical to that in the 1984 contract. (1982 allocation would be lesser of purchases or contract amount for 1981; 1983 allocation would be lesser of these amounts for 1982; therefore, because Williams purchased more than the contract amount for each of these years, Exxon was always obligated to the contract amount). The fact that this language was absent from the first year of the 1981 contract may be due to the fact that it was a new contract, whereas the 1984 contract was a renewal contract. While this language itself may have constituted a restraint on Exxon's obligation to permit growth, it must be remembered that limiting growth in and of itself is not illegal; it is only potentially illegal when used in a discriminatory manner for punitive purposes. Here, the fact that this language was included in the second and third years of the 1981 contract indicated that it was codified by Exxon as early as 1981; therefore, its inclusion in the first year of the 1984 contract cannot be viewed as the enactment of a new punitive "no growth" policy against Williams. While the language perhaps gave Exxon an opportunity to limit distributors' growth, this again returns the court to the fact that in practice Williams's quantity was never limited.

Finally, plaintiff fails to rebut defendant's reasonable interpretation of the 1984 contract: that the 1984 contract's allocation spaces were left blank only temporarily, pending Exxon's normal review of past sales, and that the relation back language was merely a stopgap measure pending the

completion of that review. Exxon's interpretation here seems the only reasonable one, especially since the figures to be determined were not only the overall quantity but also a monthly breakdown that would require more time to calculate. In addition, the fact that Williams signed the 1984 contract despite its blanks and relation back clause would seem to indicate that Williams was not dissatisfied with a contract that did not include an increased stated amount of allocation.

### 3. March 1984 Termination of Franchise

The third illustration of "no growth" implementation presented by Williams is his ultimate termination, citing the Exxon manual's goal to "minimize/*eliminate* multi-hatters." (emphasis added). Beyond the Petroleum Marketing Practices Act preemption and *res judicata* arguments that might be raised by *directly* examining plaintiff's franchise termination, *see L.C. Williams Oil Corp. v. Exxon Corp.*, 625 F.Supp. 477 (M.D.N.C.1985) (Exxon terminated Williams's franchise due to his admitted misbranding), this contention must fall. Completely terminating a distributor seems to go well beyond the reasonable "freeze" definition of "no growth." Attributing Exxon's Williams termination decision to a "no growth" plan is not reasonable when compared with attributing it to Williams's admitted misbranding. This conclusion is especially true when it is noted that Exxon uniformly terminated *all* Exxon distributors found misbranding.[6]

6. Plaintiff presents no evidence that Exxon was conducting its misbranding investigations in a discriminatory manner. Exxon's investigations were prompted by a report of Williams's misbranding by one of his competitors. Plaintiff shows neither that this "competitor" was an Exxon distributor nor that any contact between Exxon and this competitor constituted more than a simple complaint. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984) (plaintiff must show more than evidence of complaints by nonterminated horizontal distributor to supplier; plaintiff's evidence must tend to show that supplier did not act independently); *Terry's Floor Fashions, Inc. v. Burlington Industries*, 763

In sum, Mr. Carter's affidavit that Exxon never designated plaintiff as a "no growth" distributor is not refuted and is supported by Williams's affidavit that he received all the Exxon oil he requested. Summary judgment for Exxon on this claim should be granted.

### Selma Nonaccess

Plaintiff also contends that Exxon restricted his territory by denying him access to the Selma terminal, which was closer to his new accounts. While the place of delivery is normally a proper contractual term, plaintiff contends that Exxon's actions constituted an implicit territorial restriction in violation of N.C.Gen.Stat. § 75–1.1 through incorporation of the Sherman Act.[7]

Examination of this issue on summary judgment involves two steps: whether a territorial restriction constitutes an antitrust violation and whether nonaccess to a terminal different from the one listed in a franchise agreement can constitute a territorial restriction.

### A. Territorial Restrictions as Unfair Trade Practices: The Horizontal-Vertical Dilemma

Plaintiff argues not only that this type of territorial restriction may be considered an antitrust violation, but also that it *must* be. Despite the fact that Exxon is his supplier, Williams argues that any territorial restraint by Exxon constitutes a horizontal restraint, and therefore a per se violation of the antitrust laws, due to the fact that

F.2d 604, 611 n. 12 (4th Cir.1983) (applying *Monsanto* and overruling *Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207, 1213–15 (4th Cir.1983), which had held that a conspiracy could be inferred from a supplier's termination of a distributor's franchise following complaints by competing distributors).

7. Plaintiff does not contend that Exxon's denials of access to the Selma terminal also constituted exclusive dealing (retaliation against him for double branding), in violation of the Clayton Act. Exxon's denials of Selma access began in October 1982, well before plaintiff began double branding in May 1983.

Exxon is also directly servicing some stations in the Selma area.

■■■ Normally when a supplier establishes territorial lines, it constitutes a vertical restraint of trade. Because there are legitimate and even beneficial policy reasons for vertical territorial restraints,[8] they are not per se illegal but instead are examined under a rule of reason analysis, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). This situation is to be contrasted with one in which competitors at the same market level decide to divide up the various territories in order to minimize competition. This "horizontal" restraint has been called a "naked restraint of trade," *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and is per se illegal. This per se rule applies even if the supplier actually is the one to implement the territorial plan if done at the horizontal competitors' insistence. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) ("truly vertical" requirement).

■■■ This neat distinction blurs in a case such as this one, in which Exxon as supplier also happened to be at least one of the distributors—and thus a direct competitor on the same market level as plaintiff—in the area into which plaintiff was trying to expand.[9] The question thus arises whether Exxon was acting as a supplier (in a vertical capacity) or as a competitor distributor (in a horizontal capacity) when it allegedly limited Williams's territory.

Plaintiff contends that Exxon should be viewed as acting as a competitor and cites *American Motor Inns v. Holiday Inns*, 521 F.2d 1230 (3d Cir.1975), for the proposition that when a plaintiff's supplier is acting in one of its capacities on the same market level as the plaintiff, any territorial restraint is horizontal. In *American Motor Inns*, Holiday Inns' "otherwise unreasonable restraints of trade are not insulated from the antitrust laws by the fact that such company functions as a franchisor as well as a motel operator." 521 F.2d at 1253–54.

In *American Motor Inns* plaintiff applied to Holiday Inns (HI) for franchises in various areas and was denied. Under a "company-town policy," HI refused to

8. The Department of Justice recently noted that vertical restraints may actually benefit the public by (1) lowering distribution costs (by allowing a distribution to spread fixed costs over a higher sale base in a more compact area); (2) facilitating entry by new suppliers (who can give guaranteed territories to distributors); (3) giving distributors incentive to invest in and promote the products (without fear of other distributors "free riding" on their efforts); (4) allowing a supplier to limit distributors' use of its advertising to sell other suppliers' products; (5) limiting risks sufficiently to justify participation in otherwise unattractive ventures; and (6) improving product quality control. *See* Kleine, *New Department of Justice Vertical Restraints Guidelines-A Search for Legal Certainty*, 40 Bus.Law. 1335, 1344–45 (1985). Vertical territorial restraints may actually discourage monopolization as well, by protecting the smaller distributor from encroachment by larger distributors nearby.

9. Williams contends that Exxon concentrated its direct distributing efforts in "A–1" markets, which are the larger metropolitan centers. Williams contends that Exxon left the "C" markets, or less densely populated areas, to its "branded distributors," of which Williams was one. Wil-

liams's desire to have access to the Selma terminal was due to his expansion in eastern North Carolina, in which there would appear to be no "large metropolitan" "A–1" markets other than Raleigh. While the court takes judicial notice of the fact that Raleigh is only about one hour's driving time from Selma, Raleigh is no more than two hours' driving time from the Greensboro terminal that plaintiff already tapped. Thus, it seems unlikely that Exxon's denial of Selma access to Williams was a territorial restraint designed to make service of Raleigh retailers economically unfeasible due to the additional transportation costs of driving there from Greensboro, rather than from Selma.

Nevertheless, plaintiff's contention that Exxon directly distributed from its Selma terminal is not disputed and it is possible that Exxon directly sold from the Selma terminal to retailers in cities other than Raleigh. Although Williams does not indicate the extent of Exxon's direct distribution efforts, this fact will be viewed in the light most favorable to plaintiff as the non-moving party. Therefore, Exxon's direct distribution near Selma and its capacity as Williams's horizontal competitor there will be assumed.

grant franchises in parent company towns, in which HI directly owned its motels. That situation is directly analogous to the one allegedly presented in the instant case. In *American Motor Inns*, however, HI also had a "non-Holiday Inn clause" in its franchise agreements, in which franchisees either had to deal exclusively with HI or risk losing their HI franchises. Other than the "no growth" retaliation argument discussed previously, plaintiff Williams in the subject case alleges no exclusive dealing provision here analagous to this non-Holiday Inn clause. While the *American Motor Inns* court found that the *combined effect* of these territorial and exclusive dealing provisions was harmful enough to the market to constitute an antitrust violation—HI franchisees could not compete with these parent-owned inns either with other Holiday Inns or with non-Holiday Inns (unless they wanted to risk losing their HI franchises elsewhere)—it also found that "the company-town policy, *standing alone*, would be *satisfactory* because, although it resulted in an allocation of territories, it was imposed unilaterally by HI." 521 F.2d at 1240 (emphasis added). Thus, *American Motor Inns* actually contradicts plaintiff's contentions. *See also Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir.1982) ("dual distribution" system requires rule of reason analysis).

 This court does not necessarily agree with *American Motor Inns'* conclusion that such a "company-town policy" always would be "satisfactory," and finds it unnecessary to rule on the unilateral question.[10] Nevertheless, the problems with *American Motor Inns'* application to the present case indicate that territorial restrictions made by franchisors acting in such a dual role should be reviewed by no stricter a standard than a rule of reason analysis. Any territorial restraint imposed by Exxon on Williams at the very least *may* be satisfactory.

This conclusion conforms with the generally accepted rule. ABA ANTITRUST SECTION, MONOGRAPH NO. 9, REFUSALS TO DEAL AND EXCLUSIVE DISTRIBUTORSHIPS 26–28 & nn. 103, 110 (1983). *See also Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 628 (4th Cir.1977) (oil supplier is "entitled to change its system of marketing on the retail level from independent franchises to direct company operation"); *Stearns v. Genrad, Inc.*, 752 F.2d 942 (4th Cir.1984) (supplier decision to terminate remaining distributors and sell only directly upheld on summary judgment against claims under Sherman and Clayton Acts and N.C.Gen.Stat. § 75–1.1). Nevertheless, this conclusion seems virtually irreconcilable with the "truly vertical" rule discussed previously. Under that rule, territorial restraints, made by suppliers acting at the insistence of competitors of a claimant, are judged as per se illegal horizontal restraints despite the other (including legitimate) goals the supplier may wish to achieve. In the instant case, Exxon also has vertical and horizontal pres-

---

**10.** The unilateral nature of Exxon's actions was noted but not vigorously argued as a conclusive issue by defendant. The Fourth Circuit recently noted that "[c]oncerted action is the essence of a [Sherman Act] Section 1 claim," *Terry's Floor Fashions, Inc. v. Burlington Industries*, 763 F.2d 604, 610 (4th Cir.1985), and in *Copperweld Corp. v. Independence Tube Corp.*, 437 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that even a parent corporation and its wholly-owned subsidiary are "legally incapable" of conspiring in violation of Sherman Act § 1. In *Copperweld*, however, in addition to a vigorous dissent, even the majority opinion noted that "[i]t cannot be denied that § 1's focus on concerted behavior leaves a 'gap' in the Act's proscription against unreasonable restraints of trade." *Id.* at 2744.

Although no ruling is made on the issue, N.C. Gen.Stat. § 75–1.1's broad language perhaps was used by North Carolina's General Assembly precisely to fill in such "gaps" as that noted by the Supreme Court in its examination of § 1 of the Sherman Act. The *Copperweld* majority went on to note that "a single firm's anticompetitive conduct ( [even] short of monopolization) ... may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." *Id.* This harmful economic effect is especially possible in a case such as this one, in which the single firm is acting in two different capacities—as both supplier and competitor distributor.

sures for its territorial restraints—and yet its vertical pressures are considered the predominant ones, apparently contrary to the "truly vertical" rule.

It is arguable that plaintiffs in the present case should be given even more of the benefit of the doubt in the current situation, in which both the vertical and horizontal pressures emanate from the same corporate structure, making it more difficult to discover which predominated. Nevertheless, the court is unwilling to find that a per se illegality rule is appropriate here. *See White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); R. CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 10.12, at 66 (4th ed. L. Altman 1982) (per se violation, by its very nature, "can have no other purpose and effect than lessening, if not eliminating, competition"). Perhaps the "truly vertical" rule, which ignores the legitimate vertical restraint justifications that may have been present, should be modified to some type of "presumptively unreasonable rule of reason" test. After all, the per se illegality rule for horizontal agreements stems from a belief that such territorial restrictions have no purpose other than to restrain competition. When a supplier is involved—other than in a purely nominal sense—some of the legitimate reasons for vertical restraints come into play. *See* R. CALLMAN, *supra* § 10.12, at 69 (noting that the reasoning in the Supreme Court's "truly vertical" case, *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), is "not entirely convincing" because its establishment of a per se rule "neglected" the legitimate interests that may have justified the restraint). *See also Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 n. 10 (4th Cir.1985) (conspiracy between supplier and *one* competitor distributor to terminate another distributor's franchise fits more appropriately under rule of reason approach). While horizontal competitors should be prevented from circumventing antitrust laws by having their supplier do their restraining, and while plaintiffs would face difficul-

ties attempting to disprove a supplier's contention that it was acting independently despite the horizontal competitors' pressures, a per se violation rule does not seem justified in a situation in which a mixed motive is possible. While the horizontal competitors' influence "taints" the supplier's impartiality in imposing territorial restraints and thus perhaps justifies a presumption of unreasonableness, it does not completely eliminate the supplier's ability to individually evaluate the situation.

Having determined that a territorial restraint such as the one alleged here is an antitrust violation (and thus an unfair trade practice) if it fails to meet some type of rule of reason, the court turns to the question whether Williams's nonaccess to Exxon's Selma terminal may constitute a territorial restraint.

## B. Nonaccess to Selma Terminal as Territorial Restraint

It is undisputed that Exxon imposed no explicit territorial restraint on Williams. It also is undisputed that Exxon did not expressly forbid Williams from buying from other suppliers in areas in which other Exxon distributors were located. Finally, it is undisputed that Exxon provided Williams with significant increases in oil—everything he requested—out of its Greensboro terminal, even though Exxon knew Williams was expanding into these other areas closer to Selma.

Plaintiff contends, however, that Exxon's repeated denials of his requests for access to the Selma terminal, even though not required by his contract with Exxon, constituted an implicit territorial restraint on him. Plaintiff contends that the economic costs of transporting oil from the Greensboro terminal into the areas closer to Selma put him at a competitive disadvantage versus those Exxon distributors (including Exxon itself) that could tap the Selma terminal directly. Plaintiff thus presents the issue whether an economic restraint on expansion is sufficient to constitute a territorial restraint.

The court finds that it is insufficient. Plaintiff presents no case support for this contention. And while a territorial restraint need not be the result of an express agreement, *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 900 (5th Cir.1973) (territorial restraint may be implied), *purely* economic market forces normally cannot rise to the level of an unfair trade practice.

As Exxon notes, such a conclusion would allow plaintiff to unilaterally demand access to every Exxon terminal—for example, in Washington state if plaintiff acquired some customers there on a trip to the west coast. Plaintiff responds to this argument by saying that the Selma nonaccess is different because Washington is a noncontiguous terminal whereas Selma was a contiguous terminal closer to many of plaintiff's accounts. While plaintiff is correct that a territorial restraint is more likely to exist in the form of restrictions on movement into contiguous areas, plaintiff's contentions would allow a distributor such as plaintiff to unilaterally demand access to all contiguous terminals, and then to all terminals contiguous to them and so on, if it chose to expand into those areas. It is important to note here that plaintiff's expansion to service accounts near the Selma terminal was made with at least constructive knowledge—based on Exxon's repeated denials of access—that he would not be allowed to tap the Selma terminal. This case thus differs from one in which, for example, plaintiff would have been moved from the Greensboro terminal near his existing accounts to a distant terminal. In that case, economic factors such as significant increases in transportation costs might rise to the level of an unfair trade practice because they were influenced by an affirmative act of the supplier. *But see Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Here, the market factors were created by plaintiff's own decision to accept the business risk that Exxon would give him access to its Selma terminal. Absent some enforceable prom-

ise to the contrary, Exxon was not required to satisfy Williams's hopes.

Exxon never gave plaintiff such a promise. In fact, Exxon denied all of Williams's repeated requests for such access, each time citing quantity problems at the Selma terminal. Plaintiff notes that the first documented shortage at the Selma terminal did not occur until July 9, 1984, long after his requests were made. Exxon's internal records, however, indicate that motor fuel availability at the time of Williams's requests was only "fair" at the Selma terminal while it was "good" at the Greensboro terminal. Certainly Exxon was not obliged to wait for actual shortages to occur before it denied other distributors access to a terminal at risk of them.

In sum, while a territorial restraint at least conceivably could be implied from economic factors, it cannot be implied from the market factors of plaintiff's own creation here. *See* Aycock, *North Carolina Law on Antitrust and Consumer Protection*, 60 N.C.L.Rev. 205, 238 (1982) ("agreement by a seller to sell to only one buyer in a specified territory" is "almost universally upheld" absent plan to effect a monopoly). The additional expenses plaintiff faced were caused by his decision to expand into an area in which he would not have access to a nearby Exxon terminal. Even if Exxon would have preferred that Williams stayed within his original territorial confines, there is no evidence that it retaliated against him for not doing so. For the foregoing reasons, summary judgment for Exxon is appropriate on plaintiff's Unfair Trade Practices claim, i.e., Claim II.

## CONCLUSION

Exxon terminated Williams's franchise because he misbranded, as it did with all distributors who misbranded. Plaintiff's contention that he was forced to misbrand due to market costs of transportation is insufficient to survive summary judgment. *See JFC Investors Ltd. v. Gulf Products Division of BP Oil, Inc.*, 608 F.Supp. 1136, 1143 (W.D.N.C.1985), (franchisees' claim

that they were "forced" to misbrand because of franchisor's cash-basis payment requirement not plausible factually and legally insufficient). Accordingly, a judgment will be entered.[11]

---

**11.** Defendant noted at oral arguments that it would not pursue its counterclaims if summary judgment were granted against plaintiff's re-

maining claims. Accordingly, all of defendant's eight counterclaims in this action are dismissed.